UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CR-20454-BECERRA

COURT EXHIBIT
CASE NO. 23-20454
EXHIBIT NO. B

UNITED STATES OF AMERICA

v.

FRANCISCO ROBERTO COSENZA CENTENO,

Defendant.
_____/

## FACTUAL PROFFER

The United States of America (the "United States") and FRANCISCO ROBERTO COSENZA CENTENO (the "defendant" or "COSENZA"), stipulate and agree that the information stated herein is true and accurate and a sufficient basis for the defendant's plea of guilty to engaging in transactions in criminally derived property in violation of Title 18, United States Code, Section 1957, charged in Count 5 of the Indictment and the forfeiture of the assets identified in the Indictment. Had this matter proceeded to trial, the defendant stipulates and agrees that the government would have proven the facts set forth below beyond a reasonable doubt and the forfeiture allegations set forth in the Indictment by a preponderance of the evidence.

### A. Background

1.    Between in or around 2015 and at least 2020, Comité Técnico del Fideicomiso para la Administración del Fondo de Protección y Seguridad Poblacional ("TASA") was a Honduran government agency responsible for procuring uniforms and other materials for, inter alia, the Honduran National Police. Pursuant to Honduran law, TASA collected special taxes and used the money to fund procurement activities related to law enforcement and the military. TASA was controlled by the government of Honduras and performed a function that Honduras treated as its

own, and was a "department, agency, or instrumentality" of the Honduran government as those terms are used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2(h)(2)(A).

2. During the relevant period, JUAN RAMON MOLINA RODRIGUEZ was a citizen of Honduras and a Titular Director at TASA. MOLINA RODRIGUEZ was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

3. The defendant was a citizen of Honduras and Executive Director at TASA, where he reported to MOLINA RODRIGUEZ. The defendant was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A). The defendant controlled multiple companies and accounts in Central America and the United States that were used to receive and conceal bribe payments.

4. DC Investment Ltd. was a front company incorporated outside the United States and controlled by the defendant. The defendant used a bank account ending in 2941 in the name of DC Investment Ltd. ("DC Investment Ltd. Account 2941") at a bank in Belize to receive and conceal bribe payments.

5. DC Investment Holdings, Inc. was a front company incorporated under the laws of Florida and controlled by the defendant. The defendant used a bank account at U.S. Bank 1 ending in 3264 in the name of DC Investment Holdings, Inc. ("DC Investment Holdings, Inc. Account 3264") to receive and conceal bribe payments.

6. "Georgia Company 1," a limited liability company headquartered in Marietta, Georgia, owned and operated a factory in Honduras that manufactured law enforcement uniforms. Georgia Company 1 was a "domestic concern" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).

7. CARL ALAN ZAGLIN ("ZAGLIN"), a citizen of the United States and a senior executive of Georgia Company 1, was a "domestic concern," an "officer, director, employee, and agent" of a "domestic concern," and a "stockholder" acting on behalf of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(1).

8. "Executive 2," a citizen of the United States and a senior executive of Georgia Company 1, was a "domestic concern," an "officer, director, employee, and agent" of a "domestic concern," and a "stockholder" acting on behalf of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(1).

9. LUIS BERKMAN ("L. BERKMAN"), a dual citizen of the United States and Bolivia and a senior executive at Georgia Company 1, was a close relative of BRYAN BERKMAN and related by marriage to ALDO NESTOR MARCHENA. L. BERKMAN was a "domestic concern" and an "employee" and "agent" of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(1).

10. BRYAN BERKMAN ("B. BERKMAN"), a dual citizen of the United States and Bolivia and a resident of Broward County in the Southern District of Florida, during part of the scheme was an "employee" and "agent" of Georgia Company 1 and during its entirety was a "domestic concern" and an "employee" and "agent" of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(1).

11. ALDO NESTOR MARCHENA ("MARCHENA"), a dual citizen of the United States and Peru and a resident of Palm Beach County in the Southern District of Florida, was a "domestic concern" and a "director, employee and agent" of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(1).

12. MARCHENA controlled a series of entities incorporated in Florida with listed addresses in the Southern District of Florida, including "Florida Company 1," which was a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).

### B. Overview of the Scheme to Launder Bribery Proceeds

13. Beginning in or around March 2015 and continuing until in or about November 2019, ZAGLIN, Executive 2, L. BERKMAN, B. BERKMAN, and MARCHENA, together with others, agreed to pay, and did pay, bribes to Honduran government officials, including MOLINA RODRIGUEZ and COSENZA, in violation of U.S. and Honduran law, including the FCPA. In exchange for the bribes, MOLINA RODRIGUEZ, COSENZA, and other Honduran government officials assisted Georgia Company 1 in obtaining contracts with, and securing payment from, TASA. The contracts were worth over approximately $10 million and for the sale of uniforms and accessories for the Honduran National Police. COSENZA's co-conspirators used the proceeds of the contracts to make the bribe payments.

14. To launder the bribe payments, ZAGLIN, Executive 2, L. BERKMAN, B. BERKMAN, MARCHENA, MOLINA RODRIGUEZ, COSENZA, and others agreed to (i) send money from the Central Bank of Honduras in Honduras through and to bank accounts in the United States, including accounts located in the Southern District of Florida; and (ii) send money from bank accounts in the Southern District of Florida through and to bank accounts outside the United States, including in Belize.

15. As described in greater detail below, COSENZA agreed with MOLINA RODRIGUEZ to receive and share at least approximately $248,000 from Georgia Company 1, ZAGLIN, Executive 2, L. BERKMAN, B. BERKMAN, and MARCHENA as bribe payments.

COSENZA and MOLINA RODRIGUEZ received the bribes in exchange for using their official positions to assist Georgia Company 1 to obtain and retain business with, and receive payment from, the Honduran government. During the course of the conspiracy, L. BERKMAN told COSENZA that ZAGLIN authorized the bribe payments, and L. BERKMAN asked COSENZA not to talk about the bribe payments in front of ZAGLIN.

### C. The First Uniform Contract

16. Beginning in or around March 2015, ZAGLIN, Executive 2, L. BERKMAN, B. BERKMAN, and others sought to win a contract from TASA worth approximately $4.8 million for Georgia Company 1 to sell uniforms and accessories to TASA for the Honduran National Police.

17. On or about June 25, 2015, Executive 2, on behalf of Georgia Company 1, executed a contract with TASA whereby Georgia Company 1 agreed to provide the Honduran National Police with uniforms and accessories through a contract worth approximately $4.8 million (the "First Uniform Contract"). MOLINA RODRIGUEZ, as a legal representative of TASA, signed the First Uniform Contract on behalf of TASA.

### D. The Second Uniform Contract

18. On or about October 26, 2016, Executive 2, on behalf of Georgia Company 1, executed a second contract with TASA pursuant to which Georgia Company 1 agreed to provide the Honduran National Police with uniforms and accessories for approximately $5.6 million (the "Second Uniform Contract"). MOLINA RODRIGUEZ signed the Second Uniform Contract on behalf of TASA.

### E. COSENZA Receives $134,000 into Multiple Bank Accounts

19. COSENZA controlled the DC Investment Ltd. Account 2941 and DC Investment Holdings, Inc. Account 3264. In furtherance of the scheme, funds were wired from accounts controlled by MARCHENA to accounts controlled by COSENZA. Several of the transfers occurred soon after MARCHENA received contract proceeds from Georgia Company 1.

20. MARCHENA sent four transfers to two accounts totaling $134,000 dollars. Specifically:

   a. On September 30, 2016, MARCHENA transferred approximately $20,000 to DC Investment Ltd. Account 2941 in Belize;

   b. On March 24, 2017, MARCHENA transferred approximately $50,000 to DC Investment Holdings, Inc. Account 3264;

   c. On April 10, 2017, MARCHENA transferred approximately $50,000 to DC Investment Holdings, Inc. Account 3264;

   d. On May 19, 2017, MARCHENA transferred approximately $14,000 to DC Investment Holdings, Inc. Account 3264;

**F. The 2019 Corrupt Bid**

21. In or around late 2019, Georgia Company 1 and a consortium of manufacturers sought to bid on large contracts with TASA for the procurement of various goods. Georgia Company 1's bid was to be worth approximately $7.5 million.

22. While negotiations for the contracts were ongoing, COSENZA had discussions with L. BERKMAN, MOLINA RODRIGUEZ, and others about bribes to be paid using the proceeds of the contract in exchange for awarding the contract to Georgia Company 1. Georgia Company 1 did not ultimately secure the proposed contract with TASA.

### G. Additional Payments Relating to L. BERKMAN and B. BERKMAN

23. MARCHENA executed additional transfers on behalf of L. BERKMAN and/or B. BERKMAN to send bribe payments relating to separate contracts to COSENZA.

24. On or about December 18, 2017, B. BERKMAN sent $15,025 to MARCHENA at an account of Florida Company 1. On or about December 22, 2017, B. BERKMAN sent an additional $18,763 to MARCHENA at an account of Florida Company 1.

25. On or about December 26, 2017, COSENZA received into DC Investment Holdings, Inc. Account 3264 a transfer in the amount of $18,713 from an account controlled by MARCHENA. The payment was a bribe MARCHENA paid on behalf of B. BERKMAN in connection with a Honduran government contract for tear gas.

26. In or around October 2020, B. BERKMAN paid COSENZA an additional bribe in connection with a Honduran government contract involving ponchos. On or about October 2, 2020, B. BERKMAN transferred approximately $20,600 from a bank account in the Southern District of Florida to a bank account controlled by MARCHENA as a bribe payment to COSENZA.

27. Ultimately, B. BERKMAN purchased two luxury watches and delivered them to COSENZA in the Southern District of Florida in furtherance of the scheme. To fund the purchase of the watches, on or about October 8, 2020, COSENZA caused MARCHENA to transfer approximately $19,940.80 from a bank account at U.S. Bank 1 to the same account from which B. BERKMAN transferred the approximately $20,600 described above. The transfer of $19,940.80 affected interstate commerce and involved property that was derived from specified unlawful activities, *i.e.*, a felony violation of the FCPA and an offense against a foreign nation, specifically Honduras, involving bribery of a public official. At the time of the transfer, COSENZA knew that

the property involved in the transaction represented the proceeds of some form of unlawful activity.

28. During all relevant times, with regards to the bribe payments, the defendant knew that he was participating in an illegal bribery and money laundering conspiracy and that the funds he sought to transact in were the proceeds of criminal activity.

29. In total, COSENZA received approximately $188,338 in bribes.

* * *

### H. Conclusion

The preceding statement is a summary made for the purpose of providing the Court with a factual basis for the defendant's guilty plea to the charge against him. It does not include all the facts known to the defendant or the United States concerning criminal activity in which the defendant and others engaged. The defendant makes this statement knowingly and voluntarily and because he is in fact guilty of the crime charged.

LORINDA LARYEA
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

BY: _____
PETER L. COOCH
CLAYTON SOLOMON

Date: 8/13/25

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY SOUTHERN
DISTRICT OF FLORIDA

BY: _____
ELI S. RUBIN
ASSISTANT UNITED STATES ATTORNEY

By: _____
JENNY WILSON
ATTORNEY FOR DEFENDANT

Date: 8/13/25

By: _____
FRANCISCO ROBERTO COSENZA CENTENO
DEFENDANT

9